OHIO FERRO-ALLOYS CORP., APPELLANT, *v.* DONAHUE, TAX COMMR., ET AL., APPELLEES.

[Cite as Ohio Ferro-Alloys v. Donahue, 3 Ohio App. 2d 256.]

(No. 3148—Decided September 1, 1965.)

*Messrs. Day, Ketterer, Raley, Wright & Rybolt* and *Mr. John F. Buchman*, for appellant.

*Mr. William B. Saxbe*, attorney general, and *Mr. Edgar L. Lindley*, for appellee Gerald A. Donahue, Tax Commissioner.

RUTHERFORD, P. J. This is an appeal taken by Ohio Ferro-Alloys Corporation, Canton, Ohio (hereinafter sometimes called the "Company"), pursuant to Section 5717.04, Revised Code, from a decision of the Board of Tax Appeals of the state of Ohio, affirming an order of the Tax Commissioner, by which the commissioner refused to issue an air pollution control certificate, for which the Company had filed its application pursuant to the provisions of Sections 5709.20 to 5709.26, inclusive, Revised Code.

By the application the appellant requested exemption from taxation of a reinforced concrete stack approximately 400 feet high, together with the structural steel breeching which connects it to a building which houses appellant's electro-metallurgical furnaces. The actual, total cost of the stack and breeching was $236,978.34.

The plant was constructed in 1951 and is located near the village of Brilliant, Ohio, being approximately a mile from the village in a southerly or southwesterly direction. As originally constructed and when operation commenced no stack existed. The building was 250 feet long, 73 feet wide and approximately 85 feet high. At the top of the building was a monitor, about 15 feet high, running the full length of the building, with an opening 5 feet in width across the top. The smoke and dust from appellant's electro-metallurgical furnaces rose to the top of the building, because of the heat and natural draft, and was emitted from the top of the monitor.

The plant was subsequently lengthened to a total of 500 feet and an additional furnace was installed.

The volume of smoke involved is approximately 700,000 cubic feet per minute, which is estimated to contain something like five or six tons of solid material per 24-hour period. The solid materials are volitalized silica, some alumina, some magnesia, some carbon from the use of coal and coke, some iron or iron oxides and some chrome or chrome oxides. The content is primarily volatilized silica and the particles are of ten microns or less in size.

Shortly after the plant went into operation, the Company received complaints from residents of Brilliant regarding smoke coming from the plant. Representatives of the Company were asked to meet with the village council of Brilliant, to take some action to alleviate the smoke conditions and to keep the village informed concerning the action taken. As a result of complaints from villagers of Brilliant and "pressure" by the village council the Company investigated various means of correcting this smoke or dispersing it. The Rust Engineering Company of Pittsburgh, a company with extensive experience in the design and construction of industrial plants and facilities, secured information about the smoke being emitted from the Brilliant plant, weather and topographical data, etc., and on the basis of the information obtained recommended a stack or chimney 400 feet high, to be located near the furnace building and connected to the top of the monitor to remove smoke from the building at that level. This proposal was accepted by the Company, and in 1954 a contract was awarded to the Rust Engineering Company, to erect the chimney, with the breeching connection to the monitor at the top of the building. Construction was completed in 1955.

The stack does not remove any solid or gaseous substances from the smoke which is produced at the plant before discharging it into the atmosphere. It does cause the smoke to be carried to an elevation, not merely of 400 feet, but to some additional height above the chimney. The effect of this is to eliminate any heavy concentration of particles from the plant at ground level, in the vicinity of Brilliant or elsewhere. Prior to construction of the stack the pollution, i. e., concentration of pollutants, in the village of Brilliant was not as great as that to

which workers in some factories are exposed, but was much more than that in large cities. Since construction of the stack the concentration of pollutants has been reduced many times and is now less than in many large cities. There is another plant in the area and other sources which contribute to air pollution in the area but no evidence of factors which may have contributed to the improvement of conditions, other than the stack. Since erection of the stack there has been only one inquiry or complaint, and that was in 1961. The evidence shows that there are no definite standards for determining with any degree of certainty the effect of conditions, either before or now, on health. Both the amount of concentration and length of time are involved. The evidence does show that prior to erection of the stack there was damage to property.

In 1963, Sections 5709.20 to 5709.26, inclusive, Revised Code, were enacted. The effective date of these sections is October 14, 1963, and on November 1, 1963, the application by Ohio Ferro-Alloys Corporation was filed. As here pertinent, such sections provide as follows:

Section 5709.20.

"As used in Sections 5709.20 to 5709.26, inclusive, of the Revised Code:

"(A) 'Pollution control facility' means any property designed, constructed, or installed for the primary purpose of eliminating or reducing industrial air pollution which renders such air harmful or inimical to the public health or to property within this state.

"Facilities such as air conditioners, dust collectors, fans, septic tanks and other similar facilities designed, constructed, or installed solely for the benefit of personnel or by a business solely for its own benefit shall not be deemed to be pollution control facilities."

Section 5709.21.

"* * * If the commissioner finds that the proposed facility was designed primarily for control of pollution of the air, as defined in Section 5709.20 of the Revised Code, and is suitable and reasonably adequate for such purpose and is intended for such purpose, he shall enter a finding and issue a certificate to that effect. Said certificate shall permit tax exemption pursuant to Section 5709.25 of the Revised Code only for that por-

tion of such pollution control facility or that part used exclusively for air pollution control. * * *''

Section 5717.04, which provides for this appeal to this court, provides in part:

''The proceeding to obtain a reversal, vacation, or modification of a decision of the Board of Tax Appeals shall be by appeal to the Supreme Court or the Court of Appeals for the county in which the property taxed is situate or in which the taxpayer resides. * * *

''* * *

''The board, upon written demand filed by an appellant, shall within thirty days after the filing of such demand file with the court to which the appeal is being taken a certified transcript of the record of the proceedings of the board pertaining to the decision complained of and the evidence considered by the board in making such decision.

''If upon hearing and consideration of such record and evidence the court decides that the decision of the board appealed from is reasonable and lawful, it shall affirm the same, but if the court decides that such decision of the board is unreasonable or unlawful, the court shall reverse and vacate the decision or modify it and enter final judgment in accordance with such modification.''

The Company, in seeking a pollution control certificate, is seeking to obtain an exemption from tax laws of general application. For such purpose the statutes must be given strict construction and the burden of establishing its right to the exemption is upon the claimant, appellant herein. See *State, ex rel. Keller,* v. *Forney et al., Tax Comm.,* 108 Ohio St. 463, paragraph one of the syllabus:

''Exceptions to the operation of laws, whether statutory or constitutional, should receive strict, but reasonable construction.''

See, also, *National Tube Co.* v. *Glander, Tax Commr.,* 157 Ohio St. 407, second paragraph of the syllabus:

''Statutes relating to exemption or exception from taxation are to be strictly construed, and one claiming such exemption or exception must affirmatively establish his right thereto.''

This appeal is on questions of law and it is not the function

of this court to substitute its judgment for that of the Board of Tax Appeals on factual issues, but only to determine from an examination of the record whether the decision reached by the board is unreasonable or unlawful. *Hercules Galion Products, Inc.*, v. *Bowers, Tax Commr.*, 171 Ohio St. 176.

Keeping the rule of strict construction as to exemptions and our function in mind, we consider the issue in this case, to wit, was the decision of the Board of Tax Appeals, in affirming the Tax Commissioner's refusal to issue a pollution control certificate, either unreasonable or unlawful?

From the record it appears that "industrial air pollution" is a relative term which relates to the concentration of material in a given mass of air, the nature of the material and its effect.

As of this time there are three recognized devices or means of controlling air pollution. They are:

(1) Elimination or reduction of air pollution at its source by using different fuels or by using filters, dust collectors and washers, which remove all or a portion of the pollutants;

(2) Dispersion of the dust, smoke, gas, etc., *i. e.*, the pollutants, in a fashion to permit them to dilute sufficiently before they reach receptors so that the effect is very small, such as might be effected by a stack;

(3) Simultaneous emission of other material which either masks or neutralizes the pollutants.

The Board of Tax Appeals heard the appeal from the determination of the Tax Commissioner *de novo*, upon the statutory transcript supplied by the Tax Commissioner and the testimony and evidence presented to the board. The board then refused to issue a certificate upon the basis of a finding as set forth in its entry that:

"The facility must either eliminate or reduce industrial air pollution by removing entirely or greatly reducing the amount of pollutant material that would otherwise be discharged into the atmosphere."

The board in its entry then went on to say,

"Obviously, if the Legislature had intended to offer tax exemption for a facility or device which merely disperses, spreads or dilutes pollutants in the atmosphere, it could easily have done so. However it did not do so by the language it used.

*It only went so far as to offer tax exemption for facilities which were designed to eliminate or reduce the amount of pollutants* being discharged into the atmosphere." (Emphasis added.)

The fallacy of the foregoing finding of the board is that the statute does not read *"for facilities which are designed to eliminate or reduce the amount of pollutants"* as the board would have it read; rather it reads for *"eliminating or reducing industrial air pollution"* and it becomes just as obvious that if the Legislature had intended to limit reduction of pollution to that accomplished by only one of the recognized methods, that is by removal of pollutants but not by dispersion of pollutants, it would have so provided. By interpolating the word "pollutants" for the word "pollution" as used by the Legislature, the board reads into the statute something which is not there.

The theory of the board as to what the statute ought to provide appears to be derived from a text from which the board, in its entry, says the appellee in its brief highlights the problem. The board then proceeds to set forth at length quotations from the text, Air Pollution, by A. C. Stern, taken from the appellee's brief.

To get to the gist of this text we quote from that portion set forth in the board's entry, as follows:

"In 1962 it may be appropriate to consider which of several air pollution control measures may be imposed without there affecting the public purse unduly; this is true because there are still not enough of us to pose more than a marginal threat to air quality. However, the quadrupled population anticipated by the year 2062, if realized, may force consideration of basic resources as fundamental limits to survival, rather than as dollar value items effecting the cost of comfort."

The instant legislation was enacted, not in 2062 but in 1963 by legislators elected in 1962.

A 1954 report from the state of Ohio, Department of Health, by James C. Wynd, Industrial Hygiene Engineer, which is in evidence as appellant's exhibit 6, states:

"The officials of the Ohio Ferro-Alloys Company have expressed a willingness to take some steps to control the emission of smoke and dust from the Brilliant plant. Definite action has already been taken towards the planned construc-

tion of a 400 foot stack at this plant to discharge the smoke and dust at a higher level. Although this is not an ideal method of control, it may be the most practical and undoubtedly would reduce to a considerable extent the pollution of the air in the village of Brilliant.''

Section 5709.21, Revised Code, does not require that the method be the ideal one or a particular one but provides only that it must be primarily for control of *pollution* of the air, as defined in Section 5709.20, and be *suitable and reasonably adequate* for such purpose for which it is intended.

Neither the Board of Tax Appeals nor this court has legislative authority, and judicial legislation must be avoided.

The province of construing a statute is to ascertain and give effect to the intention of the Legislature. That intention must be derived from the legislation and may not be invented by an administrative board or the court. To supply the intention and then give the statute effect according to such intention would not be construction but legislation. Significance and effect should, if possible, be accorded to every word, phrase, sentence and part of the act, and in the absence of any definition of intended meaning of the words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used. See *State, ex rel. Harness,* v. *Roney,* 82 Ohio St. 376, paragraph one of the syllabus, and *Wachendorf* v. *Shaver, Recorder,* 149 Ohio St. 231, paragraph five of the syllabus. See, also, *State, ex rel. Foster,* v. *Evatt, Tax Commr.,* 144 Ohio St. 65, paragraph seven of the syllabus, and paragraph nine of the syllabus, which reads in part:

''The General Assembly cannot delegate legislative power to an administrative body * * *.''

See, also, *Slingluff* v. *Weaver,* 66 Ohio St. 621, at page 631, wherein the court said:

''* * * if the court may properly assume to place upon this law a construction in conformity with the claim of counsel * * * by the incorporation of additional words, or by the changing of the punctuation so as to give a meaning to the act inconsistent with its terms, no good reason would remain why the court could not as to any piece of legislation, alter it so as to make it conform to the court's idea of what the act should have been,

and thus substitute for the will and judgment of the body whom the people have chosen to make the laws, the will and judgment of those whom the people have chosen to expound them."

It is for the foregoing reasons that neither the Board of Tax Appeals nor this court can interpolate the word, "pollutants," for the word, "pollution," as used by the Legislature when it provided in Section 5709.20, Revised Code, that the purpose be of eliminating *or reducing* industrial air *pollution*.

It might be reasonable for the Legislature to provide for issuance of a certificate only when industrial air pollution which renders such air harmful or inimical to the public health or to property within this state has been accomplished solely by the method of removal of pollutants, but when the Legislature has not so provided and industrial air pollution which renders such air harmful or inimical to the public health or to property in this state has been reduced by other recognized methods it is a usurpation of legislative power to read into the act a limitation which the Legislature did not provide.

Since the Legislature neither qualified one recognized method nor disqualified another recognized method, but provided that, " *'pollution* control facility' means *any* property designed, constructed, or installed for the primary purpose of eliminating or reducing industrial air *pollution* which renders such air harmful or inimical to the public health or to property within this state" (emphasis added), it is our finding that the board's determination that the result if accomplished by one of recognized methods would have qualified but since it was accomplished by another recognized method did not qualify constitutes an unlawful usurpation of legislative power. It follows that the decision of the board is unlawful.

The remaining question arises from that part of Section 5709.21, Revised Code, *supra*, which provides that said certificate shall permit tax exemption pursuant to Section 5709.25, Revised Code, only for that portion of such pollution control facility or that part used exclusively for air pollution control.

Normally it would seem that a portion of the stack would be used to carry the pollutants from the plant and, to that extent, the portion so used would not be a part used exclusively for air pollution control, and only that portion of the stack above such part which is used to effectively carry the smoke

from the plant could qualify. However, in the instant case the record discloses that prior to construction of the stack, as concerned the operation of the Company, the smoke was effectively and satisfactorily carried from the plant by the monitor along top of the building. Since construction of the stack the smoke is removed from the building through the same monitor. Now the breeching carries the smoke from the monitor to the chimney where it enters not at ground level but at a height above the monitor which is approximately 85 feet above ground and then goes out the chimney at the top. The only purpose of the breeching is to make possible the use of the chimney and the only purpose of the lower part of the chimney is to support the upper part which is for the exclusive purpose of air pollution control.

It is our finding that the breeching and the stack are an air pollution control facility designed and constructed for the primary purpose of reducing industrial air pollution which renders such air harmful or inimical to the public health or property within this state. Such facility is adequate and reasonably suitable for this purpose for which it is exclusively used and it meets the requirements of Sections 5709.20 and 5709.21, Revised Code, for a pollution control certificate.

For the reasons hereinbefore stated, the decision of the Board of Tax Appeals is a usurpation of legislative authority and is unlawful and unreasonable and the decision of the Board of Tax Appeals which affirmed the decision of the Tax Commissioner is, therefore, reversed and vacated. Judgment will be entered directing that a pollution control certificate be issued in accordance with the application filed by Ohio Ferro-Alloys Corporation with the Tax Commissioner.

*Judgment accordingly.*

McLAUGHLIN and VAN NOSTRAN, JJ., concur.